UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

First Financial Security, Inc.,            **Case No. 14-cv-1843 (MJD/SER)**

    Plaintiff,

v.

                                    **REPORT & RECOMMENDATION**

Mai Lee, Gilles Moua, and Does 1–100 ,

    Defendants.

---

    Chelsea Brennan and Lousene M. Hoppe, Esqs., Fredrikson & Byron, PA, 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402, for Plaintiff.

    Clifford S. Davidson and David D. VanSpeybroeck, Esqs., Sussman Shank, LLP, 100 SW Broadway, Suite 1400, Portland, Oregon 97205, for Plaintiff.

---

STEVEN E. RAU, United States Magistrate Judge

    The above-captioned case comes before the undersigned on Plaintiff First Financial Security, Inc.'s ("FFS") Motion for Temporary Restraining Order ("TRO") [Doc. No. 7]. This matter has been referred for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A), (B), and (C), and District of Minnesota Local Rule 72.1. (Order of Referral) [Doc. No. 15]. For the reasons stated below, the Court recommends that the Motion for TRO be denied.

**I.**     **BACKGROUND**

    FFS is a life insurance broker with its principle place of business in Georgia and is incorporated in Delaware. (Mem. in Supp. of Mot. for TRO, "Mem. in Supp.") [Doc. No. 9 at 2]. FFS supports a national sales force of independent sales contractors by assisting with recruiting and training, acting as a paymaster, and assisting with the licensing, contracting, and

policy underwriting processes. (*Id.* at 3). Each sales contractor signs the First Financial Security, Inc. Sales Contract Agreement (the "Agreement"), which prohibits, *inter alia*, the sales contractor from inducing an FFS customer to terminate or reduce his or her coverage, inducing another FFS contractor to terminate his or her affiliation with FFS, using the confidential information or trade secrets of FFS, and soliciting other contractors to purchase products other than those offered by FFS. (*Id.* at 7–8); *see* (Agreement, Ex. A) [Doc. No. 27 at §§ C.2, C.3, C.4, C.5].[1] The Agreement requires the sales contractor to acknowledge that all FFS contractors have signed the Agreement and that inducing a breach of the Agreement constitutes wrongful interference with contract, that a violation of the Agreement entitles FFS to seek injunctive relief, and that if the contractor breaches the Agreement, he or she is not entitled to receive any additional compensation payments from FFS. (Mem. in Supp. at 8); (Agreement §§ C.6, C.7, C.9). Lists of FFS's sales contractors and customers are confidential and not available to the public. (Mem. in Supp. at 5–6).

FFS employed Defendants Mai Lee ("Lee") and Gilles Moua ("Moua") (collectively, "Defendants") as independent sales contractors. (*Id.* at 2–3). Moua was an Executive Field Chairman, meaning he was at the top of his hierarchal sales team, and received the highest level of compensation. (*Id.* at 2, 4). Contractors at higher levels of their sales team hierarchy receive payments based on sales made by the sales team beneath them, called the "down-line" team. (*Id.* at 4). Defendants managed Moua's sales team together, despite Lee's lower position, and they referred to each other as business partners. (*Id.* at 3). Both Moua and Lee assented to the

---

[1] FFS filed the Agreement on June 18, 2014, as an attachment to the Complaint. (Agreement). The Agreement was also submitted in FFS's documents supporting the Motion for TRO. *See* (Ex. 1, Attached to Decl. of Meg Jones in Supp. of Mot. of TRO, "Jones Decl.") [Doc. No. 10].

Agreement. (*Id.* at 9); *see also* (Decl. of Ryan Dunbar in Supp. of Mot. for TRO, "Dunbar Decl.") [Doc. No. 11 ¶ 27].

FFS claims Defendants held a meeting at their shared home in Minnesota on May 10, 2014, with some of their team members. (*Id.* at 9). At that meeting, Defendants allegedly encouraged team members to end their affiliation with FFS, and to work for Defendants at a competing insurance brokerage firm, Freedom Equity Group ("FEG"). (*Id.*). Defendants resigned the same day. (*Id.*). Over the next twelve days, FFS received over 1,300 resignations from members of Moua's sales team. (*Id.* at 9–10). This number of resignations is twenty times more than FFS's annual average of resignations. (*Id.* at 10).

FFS filed its Complaint against Lee, Moua, and Does 1–100 on June 9, 2014, asserting claims for breach of contract, misappropriation of trade secrets in violation of Minnesota Statute section 325C.03, and declaratory judgment.[2] (Compl.) [Doc. No. 1]. The following day, FFS moved for a TRO requiring Defendants to:

> cease all use of FFS's confidential trade secrets, including FFS sales contractor lists and customer lists; to cease soliciting, recruiting, inducing or otherwise engaging any FFS contractors to leave FFS to work in connection with, or in any way be associated with FEG or any other FFS competitor, or from otherwise inducing sales contractors to breach the [] Agreement; to cease working with FFS customers and working with contractors recruited from FFS in violation of the [] Agreement; and to pay into Court all income received from FEG based on sales from contractors that Defendants recruited from FFS.

(Mem. in Supp. at 12). The Court heard oral argument on June 19, 2014. (Minute Entry Dated June 19, 2014) [Doc. No. 29]. Defendants did not respond to the Motion for TRO or appear at the hearing. *See* (*id.*). FFS filed a supplemental memorandum the following day and attached

---

[2]  Because Does 1–100 are unnamed and not described in the Complaint, the Court uses the term "Defendants" to refer to Lee and Moua only. *See* (Compl. ¶¶ 2–4) (listing parties).

three exhibits it presented to the Court during the hearing. (Supplemental Mem. in Supp. of Mot. for TRO, "Suppl. Mem. in Supp.") [Doc. No. 30].

## II.    DISCUSSION

### A.    Legal Standard

Preliminary injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted). The movant bears "the burden of establishing the propriety of an injunction. . . ." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). To determine whether it should issue a TRO, a court considers four factors, known as the *Dataphase* factors: (1) the probability that the movant will be successful on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between that harm to the movant and "the injury granting the injunction will inflict on other parties litigant[,]" and (4) the public interest. *Laclede Gas Co. v. St. Charles Cnty., Mo.*, 713 F.3d 413, 419 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)); *see also Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 916 (D. Minn. 2004) (MJD/JGL) (applying the *Dataphase* standard to both temporary restraining orders and preliminary injunctions). "[N]o single factor is determinative[]" and "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

### B.    Analysis

#### 1.    Likelihood of Success

FFS claims it is likely to succeed on its claims for breach of contract and misappropriation of trade secrets. (Mem. in Supp. at 13–19). "A TRO 'motion is too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with

mathematical precision.' . . . The court does not decide whether the movant will ultimately win, or if a greater than fifty-percent likelihood of success exists." *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 695 (D. Minn. 2012) (DSD/SER) (quoting *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624 (8th Cir. 1987) and citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991)). FFS only needs to demonstrate that it is likely to succeed on one of its claims in order to show a likelihood of success for the purposes of issuing a TRO. *Id.* The Court addresses each of FFS's claims in turn.

### a. Breach of Contract

FFS claims Defendants breached their contracts by

(1) inducing, or attempting to induce, FFS customers to terminate, or reduce the coverage under [the] customer's policies, during the term of the Agreement and for two years thereafter within 50 miles of the contractor's office(s); (2) inducing, or attempting to induce, other FFS contractors to terminate their affiliation with FFS, during the term of the [] Agreement and for two years thereafter within 50 miles of the contractor's office(s); and [(3)] refusing to immediately return confidential information, including customer lists and sales contractor lists.

(Compl. ¶ 56); *see also* (Compl. ¶ 57).

Breach of contract is a common law claim and FFS argues that the Agreement "provides that Georgia law applies to interpretation of the [] Agreement without recourse to Georgia choice-of-law principles." (*Id.* at 13) (citing Agreement § K.10). But that section states that it does not apply to the "Covenants . . . to which the parties do not specify an agreed upon choice of law . . . ." (Agreement § K.10). The Covenants include the provisions of the Agreement that FFS claims Defendants breached. *Compare* (Agreement §§ C.2, C.3, C.4) *with* (Compl. ¶ 56). Therefore, the Agreement does not contain a choice-of-law provision with respect to FFS's breach of contract claims.

5

### i. Choice of Law

The Court must apply Minnesota's choice of law principles in determining whether to utilize Georgia or Minnesota state law in reviewing FFS's claims. *See Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc.*, 262 F. Supp. 2d 1004, 1010 (D. Minn. 2003) (DSD/FL) (citing *Fuller v. Harford Life Ins. Co.*, 281 F.3d 704, 707 (8th Cir. 2002)) (stating that "[a] federal court sitting in diversity must apply the choice of law principles of the state in which it sits, in this case Minnesota.").[3] The Court must first determine whether an outcome determinative conflict exists. *Honeywell, Inc. v. Ruby Tuesday, Inc.*, 43 F. Supp. 2d 1074, 1077 (D. Minn. 1999) (DSD/JMM) (citing *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994)); *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000). If there is no conflict, the Court applies the law of the forum, and no further inquiry is necessary. *Minn. Pipe & Equip. Co. v. Ameron Int'l Corp.*, 938 F. Supp. 2d 862, 871 (D. Minn. 2013) (JRT/FLN) (citation omitted).

The elements of breach of contract in Georgia and Minnesota do not conflict. *See FieldTruf USA Inc. v. TenCate Thiolon Middle East*, 945 F. Supp. 2d 1379, 1396 (N.D. Ga. 2013) (stating the elements of breach of contract in Georgia are breach and damages "to the party who has the right to complain about the contract being broken") (quoting *Kuritzky v. Emory Univ.*, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008)); *Chambers v. The Travelers Cos., Inc.*, 764 F. Supp. 2d 1071, 1087 (D. Minn. 2011) (MJD/JJK) (stating the elements of breach of contract in Minnesota are formation of the contract, plaintiff's performance of conditions precedent, and breach of the contract).

---

[3] FFS filed its lawsuit in this District based on diversity jurisdiction. (Compl. ¶ 5).

Further, the Court finds that it is likely both Georgia and Minnesota would enforce the Agreement, which is essentially a noncompete agreement. In Minnesota, courts disfavor and scrutinize noncompete agreements because they restrain trade. *Benfield*, 351 F. Supp. 2d at 917 (citing *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982)). A court may enforce a noncompete agreement if it is reasonable and supported by consideration. *Life Time Fitness*, 854 F. Supp. 2d at 696. Whether a noncompete agreement is reasonable considers the following factors: "(1) whether the restraint is necessary for the protection of the business or goodwill of the employer, (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests, (3) how long the restriction lasts[,] and (4) the geographic scope of the restriction." *Id.* (citing *Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985) (interpreting Minnesota law)). Georgia courts review noncompete agreements using similar elements. *See Coleman v. Retina Consultants, P.C.*, 687 S.E.2d 457, 460–61 (Ga. 2009) (stating that the reasonable determination considers the "nature and extent of the trade or business, the situation of the parties, and all other circumstances" and "[a] useful tool in examining the reasonableness of a particular factual situation consists of a three-element test of duration, territorial coverage, and scope of activity.") (citations and quotation omitted).

The Court finds that under either Georgia or Minnesota law, it is likely that FFS will succeed in showing that the Agreement is enforceable. The Agreement prohibits Defendants from soliciting FFS customers to terminate or reduce their coverage for a period of two years after termination, and applies to all FFS customers within fifty miles of the contractor's office. (Agreement § C.2). In addition, the Agreement prevents Defendants from encouraging other FFS contractors within fifty miles of Defendants' residence for two years after termination to terminate their relationship with FFS. (*Id.* § C.3). These terms are necessary to protect FFS's

business, and are not greater than necessary. *See Life Time Fitness*, 854 F. Supp. 2d at 696. Additionally, these terms are reasonable in the context of the life insurance brokerage business and are narrowly tailored to specific, reasonable activity. *See Coleman*, 687 S.E.2d at 460–61.

Because there is no conflict of law between Minnesota and Georgia's elements for breach of contract, and because "choosing one state's law over the other is not outcome-determinative," the Court does not conduct a further conflict-of-law analysis. *Milwaukee Mut. Ins. Co. v. Deere & Co. Inc.*, No. Civ. 04-4905 (MJD/JGL), 2005 WL 2105513, at *2 (D. Minn. Aug. 26, 2005). The Court applies the law of the forum, Minnesota. *See Minn. Pipe & Equip.Co*, 938 F. Supp. 2d at 871 (citation omitted).[4]

### ii. FFS is Likely to Succeed on its Breach of Contract Claim.

FFS's Complaint, Memorandum in Support of the Motion for TRO, and supporting documents show it is likely to succeed on its breach of contract claim.

First, FFS has information demonstrating that Defendants held a meeting at their home on May 10, 2014, and starting that day and continuing for twelve days, FFS received over 1,300 resignations from members of Moua's sales team. (Mem. in Supp. at 9–10). Some of these resignations included emails from FEG, who Defendants now work for, to former FFS sales contractors, welcoming them to FEG. (Jones Decl. ¶ 51); (Ex. 6, Attached to Jones Decl.). FFS

---

[4] In Minnesota, a court may modify the duration of a noncompete agreement's restriction if it finds the period in the contract is unreasonably long. *Benfield*, 351 F. Supp. at 917 (citing *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 (Minn. 1980)). This is called the blue-pencil doctrine. *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n.8 (Minn. 2002) (citing *Davies & Davies Agency*, 298 N.W.2d at 131 n.1). But in Georgia, "if only a portion of a non-compete clause in an employment contract would be unenforceable, the entire covenant must fail because [a court] will not apply the blue-pencil theory of severability to such restrictive covenants." *Coleman*, 687 S.E.2d at 461 (citation omitted). On this procedural posture, whether and how the court may ultimately "blue pencil" the FFS contract is premature when considering FFS's likelihood of success on the merits for the purposes of determining whether a TRO is appropriate. *See Life Time Fitness*, 854 F. Supp. 2d at 695.

also received an email sent from FEG through Lee to a former member of Moua's team, Thuan Pham ("Pham"), instructing Pham how to get appointed with an insurance carrier that has a relationship with FFS and FEG. (Decl. of Ben Cook in Supp. of Mot. for TRO, "Cook Decl.") [Doc. No. 13]; (Ex. 17, Attached to Cook Decl.). Therefore, FFS is likely to succeed in showing that Defendants induced fellow FFS contractors "to terminate their affiliation with FFS." *See* (Agreement § C.3).

Second, FFS has shown that Defendants refused to return confidential information in violation of the Agreement. *See* (Mem. in Supp. at 11); (Agreement § C.4). FFS sent letters to Defendants requesting that they return confidential information (the list of FFS contractors and customers) under the terms of the Agreement. (*Id.*); *see also* (Decl. of David D. VanSpeybroeck in Supp. of Mot. for TRO, "VanSpeybroeck Decl.") [Doc. No. 14 ¶ 2]; (Ex. 18, Attached to VanSpeybroeck Decl.). Lee did not respond. *See* (VanSpeybroeck Decl. ¶ 6). Moua responded, but did not return any confidential information. *See* (*id.* ¶ 5); (Ex. 21, Attached to VanSpeybroeck Decl.).[5]

Finally, FFS states it has received cancellations from customers associated with Moua's former team. (Mem. in Supp. at 10). FFS also received notices of chargebacks, which are based on cancellations and/or failures to pay premiums. (*Id.*). The chargebacks are also associated with Moua's former sales team. (*Id.*). FFS must pay the carrier for chargebacks based on customers' failure to pay premiums, which constitute policy lapses. (*Id.*). FFS passes these chargebacks to the sales contractor and contractors "up-line," who must then repay FFS. (*Id.*).

---

[5] Although the Court finds FFS is likely to succeed in showing that Defendants have refused to return confidential information, the Court notes that FFS has not advised how lists of sales contractors and customers are stored within FFS or distributed to its sales contractors. Additionally, FFS has not shown that these lists are actually in Defendants' possession, either by access to electronic copies or by receipt of paper copies.

FFS does not make any showing that the customers who cancelled their policies decided to do so because a member of Moua's former sales team reached out to those customers, because the sales contractor who initially sold the policy left FFS to go to FEG, or because those customers then received another policy through FEG. Based on the record submitted, the Court is doubtful FFS will succeed in showing that Defendants breached the Agreement by inducing customers to terminate their policies or reduce their coverage. *See* (Agreement § C.2). But because FFS is likely to succeed in showing other breaches of the Agreement, the Court overall finds FFS likely to succeed on its breach of contract claim.

### b. Misappropriation of Trade Secrets

FFS also alleges Defendants misappropriated trade secrets in violation of the Minnesota Uniform Trade Secrets Act. (Compl. ¶¶ 61–65). But because the Court finds FFS is likely to succeed on its breach of contract claim, it need not discuss the trade secrets claim. *Life Time Fitness*, 854 F. Supp. 2d at 695–96 (citing *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002)) (stating that to satisfy the likelihood-of-success prong of the *Dataphase* factors, plaintiff only needs to demonstrate that it is likely to succeed on one claim).

### c. FFS's Likelihood of Success Weighs in Favor of Granting the TRO

Because FFS has shown that it is likely to be successful on the merits of at least part of its breach of contract claim, this *Dataphase* factor weighs in favor of granting the TRO.

### 2. Irreparable Harm

To show that it will suffer irreparable harm without the TRO, FFS "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (internal quotation and citation omitted). "Irreparable harm occurs when a party has no adequate

10

remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Additionally, FFS must show that the irreparable injury is based on a current threat, not a past one. *United Healthcare Ins. Co.*, 316 F.3d at 741.

FFS first argues it will suffer irreparable harm "if the contractor lists are used or disclosed[]" because "[t]here can be no replacement for a team of skilled and trained sales contractors." (Mem. in Supp. at 20). FFS goes on to argue "Moua is the leader of a powerful sales team that follows his lead. Enjoining him from taking his team and confidential customer lists and contractor lists to FEG will discourage many other team members from joining him there." (*Id.*). While it may be true that money cannot recreate a trained sales force, this harm has already occurred. Over 1,300 out of 1,404 members of Moua's former sales team already resigned. *See* (*id.* at 2, 10). These resignations took place during a finite period of time: between May 10, 2014, and May 22, 2014. (*Id.* at 10). Although FFS filed its Motion for TRO on June 10, 2014, FFS does not describe any resignations occurring after May 22, 2014.[6] *See* (*id.* at 10). This indicates that, to the extent Defendants made a concerted effort to violate the Agreement by inducing other FFS sales contractors to terminate their affiliation with FFS, that event already happened. Therefore, to the extent FFS seeks a TRO enjoining Defendants from soliciting FFS contractors or using sales contractor lists, there is no longer a current threat for the Court to prevent by issuing a TRO. *See United Healthcare Ins. Co.*, 316 F.3d at 741; *see also* (Mem. at 12) (identifying relief requested).

---

[6] The timing is important not to suggest that FFS's Motion was untimely, but to show that if additional resignations occurred after May 22, 2014, FFS would have or should have had notice of them before filing its Motion for TRO.

11

Second, FFS argues that it is "extremely difficult" to calculate the damages the Defendants' departure caused FFS because insurance policies can be renewed for the customers' lifetime and Defendants are likely unable to satisfy a money damages award in the amount FFS is seeking. (*Id.* at 21); (Suppl. Mem. in Supp. at 1-2). FFS itself offers several methods to calculate damages: FFS estimates Moua's former sales team is responsible for $104,000 in chargebacks to date, and Moua's former sales team represented "42% of FFS'[s] 2013 commission income of $25,500,000." (Mem. in Supp. at 10–11, 21). Because FFS is able, at this early stage, to provide rough, back-of-the-envelope damages calculations, the Court finds that money damages are available. *See Gen. Motors Corp.*, 563 F.3d at 319.

Third, Defendants' inability to pay damages is not supported by the record before the Court. The Eighth Circuit provides that a preliminary injunction may be appropriate where "the plaintiff has demonstrated sufficient evidence to support the claim that it will be unable to recover absent a preliminary injunction, . . ." by considering "the non-movant's resources and the potential magnitude of eventual damages." *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987) (citing *Signode Corp. v. Welde-Loc Systems, Inc.*, 700 F.2d 1108, 1111 (7th Cir. 1983)). FFS does not present any record of Defendants financial resources, beyond the mere assertion that "neither Moua nor Lee has sufficient assets to compensate FFS for its loss." (Mem. in Supp. at 21). And, as described above, the Court is skeptical about FFS's likelihood of success in showing that Defendants are using FFS's customer lists. Thus, the remaining calculation of damages is based on those damages associated with FFS's ability to prove Defendants violated the Agreement by recruiting former FFS sales contractors. *See* (Agreement § C.3). FFS states that Moua's former sales team is responsible for "42% of FFS'[s] 2013 commission income of $25,500,000." (Mem. in Supp. at 21). FFS is unclear about whether

Moua's sales team is responsible for 42% of FFS's **total** 2013 commission income of $25,500,000 (which would be $10,710,000) or whether $25,500,000 is 42% of FFS's total 2013 commission income (meaning FFS's total 2013 commission was approximately $60,714,286). At this early stage of the proceedings, the Court cannot determine that Defendants are insolvent, or that the potential damages compared to Defendants' lack of resources, constitutes irreparable harm. *See Airlines Reporting Corp.*, 825 F.2d at 1227 (citing cases describing scenarios where a preliminary injunction was issued because a defendant was insolvent or would be before final judgment was entered).

Fourth, to the extent FFS argues Defendants used or are using customer lists to induce FFS customers to cancel or reduce their coverage under FFS policies, the damages are easily calculable. FFS has already identified seventy-four policies it believes fall into this category, and that $104,000 worth of chargebacks are attributable to Moua's former sales team at FFS. (Mem. in Supp. at 10–11). This demonstrates that FFS's damages with respect to any misuse of customer lists are quantifiable in terms of dollars.[7] *Cf. Wood v. Kapustin*, Civ. No. 13-1495 (DSD/AJB), 2013 WL 3833983, at *4 (D. Minn. July 23, 2013) (quoting *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("'Loss of intangible assets such as reputation and goodwill can constitute irreparable injury. Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars.'"); *see also U.S. Water Servs., Inc. v. Int'l Chemstar, Inc.*, Civil No. 13-3092 (ADM/TNL), 2013 WL 6147696, at *4 (D. Minn. Nov. 22, 2013) (stating that "loss of a customer's business due to [defendants'] improper solicitations are compensable through a monetary damages award"). FFS makes no argument that its

---

[7] This is also true for FFS's request for the Court to require Defendants "to pay into Court all income received from FEG based on sales from contractors that Defendants recruited from FFS." (Mem. in Supp. at 12). If FFS ultimately is successful, those amounts are quantifiable.

reputation or goodwill, which are "'difficult, if not impossible, to quantify in terms of dollars[,]'" will be damaged. *Wood*, 2013 WL 3833983, at *4 (quoting *Med. Shoppe Int'l, Inc.*, 336 F.3d at 805).

Finally, at oral argument, FFS argued that the parties agreed that damages would be an insufficient remedy. *See* (Agreement § C.7). While this term is persuasive, it is not conclusive of irreparable harm. *See Tri-State Grease & Tallow Co., Inc. v. Milk Specialties Co.*, Civ. No. 11-709 (RHK/JSM), 2011 WL 1561674, at *7 n.12 (D. Minn. Apr. 22, 2011) (citing *Baskin-Robbins Inc. v. Patel*, 264 F. Supp. 2d 607, 611 (N.D. Ill. 2003)); *Allan Block Corp. v. E. Dillon & Co.*, No. Civ. 04-3511 (JNE/JGL), 2005 WL 1593010, at *6 (D. Minn. July 1, 2005) (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004)); *see also Baker's Aid, a Division of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2nd Cir. 1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question [of] whether preliminary injunctive relief is appropriate.").

After considering all the factors, the Court finds that, in spite of the parties' agreement about irreparable harm, FFS has not demonstrated that a TRO would prevent a future harm or that money damages are inadequate. Therefore, the Court finds that FFS has not shown it will suffer irreparable harm, which is sufficient, by itself, to deny issuance of a TRO. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998). For the sake of completeness, the Court analyzes the remaining factors.

### 3.   **Balance of Harms**

When considering the balance of harms, the court compares the threat of irreparable harm to FFS with the harm Defendants would suffer if the Court issues the TRO. *See Dataphase*, 640

F.2d at 114.  As discussed above, the Court finds there is no threat of irreparable harm that will incur in the future or that is not compensable by money damages.  In contrast, FFS asks for a TRO that would harm Defendants:  FFS asks the Court to enjoin Defendants from working with contractors recruited in violation of the Agreement.  (Mem. in Supp. at 12).  FFS points to no term in the contract that would support this extraordinary relief, and the Court can find none.  *See generally* (Agreement).  Under FFS's argument, issuance of the TRO would not "preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113.  Instead, FFS seeks to change the current situation by asking the Court to prevent Defendants from working with other sales contractors at FEG who were formerly employed by FFS.  (Mem. in Supp. at 12).

The balance of harms weighs against issuing the TRO.

### 4. Public Interest

Public interest favors enforcing contracts, which weighs in favor of FFS, and also favors competition, which weighs in favor of Defendants.  *See Benfield, Inc.*, 351 F. Supp. 2d at 919.  Therefore, this factor is neutral.

### 5. Conclusion

Although FFS is likely to succeed, at least in part, on its breach of contract claim, it fails to establish that it will suffer irreparable harm.  Because the lack of irreparable harm alone is "a sufficient ground upon which to deny a preliminary injunction[,]" the Court recommends that FFS's Motion for a TRO be denied.  *See See United Indus. Corp.*, 140 F.3d at 1183.

## III. RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff First Financial Security, Inc.'s Motion for Temporary Restraining Order [Doc. No. 7] be **DENIED**.

Dated: June 24, 2014

                                              *s/Steven E. Rau*
                                              STEVEN E. RAU
                                              United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 1, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **seven (7) days** after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.